In the Matter of: FRANK B. STEVENSON, S. S. No. 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, Claimant-Employee, et al., NORTH CAROLINA FINISHING COMPANY, SALISBURY, N. C., Employer, and EMPLOYMENT SECURITY COMMISSION OF NORTH CAROLINA.

(Filed 15 April, 1953.)

1. **Master and Servant § 61—**

Where the employer resists recovery of unemployment compensation on the ground that claimants' unemployment was due to a work stoppage resulting from a labor dispute, the burden is on claimants to show to the satisfaction of the Commission that their claims are not disqualified for benefits under G.S. 96-14 (d).

**2. Master and Servant § 62—**

On appeal to the Superior Court from any final decision of the Employment Security Commission, the findings of the Commission as to the facts, if supported by evidence, and in the absence of fraud, are conclusive, and the jurisdiction of the Superior Court is confined to questions of law. G.S. 96-15 (i).

**3. Master and Servant § 60—**

The evidence in this case *is held* to support the findings of the Employment Security Commission to the effect that the unemployment of claimants after the termination of the strike in which claimants participated was due to the time reasonably required physically to resume normal operations in the chain process method used in the plant, and therefore was due to stoppage of work attributable to a labor dispute, and that claimants were not entitled to unemployment compensation by reason of the provisions of G.S. 96-14 (d).

APPEALS by Frank B. Stevenson, claimant employee, and others of like status, from *Moore, J.,* at November Term, 1952, of ROWAN.

Proceeding under the Employment Security Law, Chapter 96 of the General Statutes of North Carolina, to determine claims and disqualifications for unemployment benefits, particularly as affected by provisions of G.S. 96-14 (d).

A hearing was duly had after notice at Salisbury on Friday, 27 June, 1952, before a special claims deputy of the Employment Security Commission to determine whether or not the unemployment of the claimant employees, the appellants, in this proceeding, at the time of filing claims during June, 1952, and thereafter, was due to a stoppage of work caused by a labor dispute at the plant of the North Carolina Finishing Company, Salisbury, North Carolina.

The record on this appeal discloses (1) that counsel (a) for all claiming employee appellants, (b) for North Carolina Finishing Company, employer, and (c) for the Employment Security Commission stipulated at the hearing on above date that as to appellants there was a stoppage of work at the plant of the North Carolina Finishing Company at Salisbury, North Carolina, involving all production and maintenance employees, commencing at 7 o'clock a.m. on Monday, 24 March, 1952, as the result of a labor dispute over a new contract, the old contract by and between Local 440 and the Company having expired at midnight on 23 March; (2) that such stoppage of work continued until the date which may be developed in this record; (3) that on Saturday, 7 June, 1952, Local 440, United Textile Workers of America, A.F.L., sent a telegram to the manager of North Carolina Finishing Company notifying the company that the strike of its employees represented by the Union was ended as of that day, and that all employees were available for work as of that day, and would report for work, and that the Union would co-operate

in every way in resuming operations in an orderly manner; and (4) that all of the claiming employees, appellants, were unemployed during the strike which was the result of the labor dispute and that they participated, and were interested in the strike and the causes thereof.

At such hearing testimony of witnesses was taken, and the claims of two groups referred to as Exhibits 1 and 2 were considered. Those included in Exhibit 1 do not appeal from denial of their claims. Those listed in Group Exhibit 2, who filed claims in June, 1952, are the appellants. Hence only the pertinent parts of findings of fact made by the special claims deputy in respect to them are necessary to consideration of this appeal. They are as follows:

"1. The North Carolina Finishing Company is a corporation with its plant and general offices located about five miles north of Salisbury, North Carolina, on U. S. Highway No. 29. The plant so located as described hereinabove is the only plant that such company operates. The company, hereinafter referred to as the employer, is engaged in the business of bleaching, dyeing, and finishing of cotton and rayon fabrics, and also is engaged in the manufacture of pillow slips and sheets from some of the finished products. A more general designation for its business is that of a textile finisher. There are approximately eleven or twelve hundred individuals employed by the employer.

"2. There are three departments or divisions of the employer's business, one being the cotton finishing department, another the rayon finishing department, and the third, the department in which sheets and pillow slips are manufactured. The employer does not actually manufacture the cloth but the cloth is obtained in the grey state from the manufacturers to be finished. The bleaching, dying and finishing of cotton cloth is customarily performed at the place where the cloth is actually manufactured and the finishing process is not customarily carried on and performed as a distinct and separate function nor as a separate branch of work or separate business in separate premises. The finishing of rayon cloth is likewise usually finished at the place where it is manufactured and is not usually a separate branch of work which is commonly conducted as a separate business but it is usually conducted in conjunction with the manufacture of such cloth. The employer likewise manufactures sheets and pillowcases from some of the cloth which it finishes for other companies. The employer also purchases some cloth in the grey state which it finishes for itself and which it manufactures into sheets and pillowcases for its customers. Sheets and pillowcases are generally manufactured at the same place where the cloth is manufactured and finished and it is not customary for such an operation to be conducted as a separate branch of work and as a separate business in separate premises. . . .

"4. . . . The method of this employer's operation is what is commonly known as a chain process, in which each worker is dependent upon work carried on by other workers, and such process is a continuous integrated process of finishing cloth and in the manufacture of those products hereinbefore referred to. . . .

"6. . . . When the stoppage of work occurred on March 24, 1952, the employer had ample orders and ample raw material with which to work and to process, but due to the stoppage of work caused by the labor dispute it was necessary for the employer to cancel the orders which it had on hand and to return to the manufacturers the goods which it had on hand to process for those manufacturers, in view of this situation. After the union called off the strike on June 7, 1952, it was therefore necessary for the employer to secure new orders and to get the necessary raw products into its plant in order to resume operations and as of that date of the hearing before the undersigned Special Claims Deputy on June 27, 1952, the employer was still in the process of getting new orders and of replenishing its supplies of the raw products from the manufacturers of those products, and the fact that the employer did not have these raw products on hand when the strike was called off was a direct result of the stoppage of work which was caused by the labor dispute. Furthermore, at the time that stoppage occurred on March 24, there were sufficient orders and raw products on hand for the employer to have continuously operated for a period of at least five or six weeks, even if no further orders and raw products had been secured in the meantime.

"7. Due to the fact that the plant had been closed for several weeks on account of the stoppage of work which was the result of the labor dispute, it was necessary for the machinery, boilers and other equipment at the plant to be inspected and made ready before the actual manufacturing operations were started and a few days elapsed between the time the union called off the strike and before any manufacturing operations could start or processing operations could start. A few of the employees, including some of the claimant-employees, returned to work at the employer's request on or about June 10, 1952, and the number returning to work gradually increased as the processing of the goods and material progressed until on June 27, 1952, the date of the hearing before the undersigned Special Claims Deputy, approximately 85% of the production and maintenance employees were back at work, which enabled the employer to reach approximately 70% of its normal production as of June 27, 1952. At the time of the hearing, however, there were still approximately 15% of the employees away from work because, in a process of this nature considerable time is consumed in reaching normal production and in securing enough raw products with which to carry on full operation and the unemployment of the 15% of the employees who

were still out at the time of the hearing is due directly to the stoppage of work which was a result of the labor dispute and any unemployment of any and all individuals involved in this proceeding during the period beginning March 24, 1952, to and including June 27, 1952, was caused by the stoppage of work attributable to the labor dispute. . . .

"11. Even though approximately 85% of the employees are back at work, there still remains a substantial stoppage of work at the plant or premises of the North Carolina Finishing Co., which stoppage of work is a direct result of the labor dispute and the unemployment of any and all individuals whose names appear on Exhibits No. '1' and No. '2' is due to a stoppage of work caused by a labor dispute which exists at such plant."

Upon these findings of fact, the Special Claims Deputy held as a matter of law, and adjudged that the claimant-employees whose names appear on Exhibit No. 2 are disqualified for benefits beginning 24 March, 1952, and continuing so long as there is a stoppage of work attributable to a labor dispute at the plant of North Carolina Finishing Company.

These claimant-employees appealed therefrom, and the proceeding was removed to the Full Commission for hearing and disposition.

On such hearing the Commission, reciting that it appearing from an examination of the record that the facts as found by the Special Claims Deputy are supported by the evidence in the record, and that the decision is in conformity with the Employment Security Law of North Carolina, and should be affirmed, ordered, adjudged and decreed that the decision of the Special Claims Deputy be, and the same is thereby affirmed in all respects, and that it is declared to be the final decision of the Commission.

Thereupon, pursuant to G.S. 96-15 (i) Frank B. Stevenson and all other claimants of his group affected by the decision so made, appealed therefrom to Superior Court of Rowan County, North Carolina. Review was sought upon grounds stated,—all pivoting upon finding of fact and conclusion of law that the unemployment of the claimants was due to a stoppage of work attributable to a labor dispute.

Upon hearing on such appeal, the judge of Superior Court, "having examined the evidence set out in the record upon appeal from said Commission, being of the opinion that the findings of fact made by the Special Claims Deputy are supported by competent and substantial evidence; and that the conclusions of law made by the Special Claims Deputy . . . are in conformity with the law; and that the decision or order of the Commission affirming said decision . . . and declaring such decision to be the final decision of the Commission is in all respects proper, and . . . should be affirmed," adjudged that the decision of the Commission "be, and the same is hereby affirmed in all respects."

These are the appeal entries in pertinent part: "To the foregoing judgment, Frank B. Stevenson, claimant-employee, *et al.,* including each

claimant, object and except to the signing of the judgment and to the judgment as signed and as same appears of record, and except to the findings that (1) the findings of the Special Claims Deputy are supported by competent and substantial evidence; (2) that his conclusions of law are correct; (3) that the decision of the Commission is proper. Notice of appeal to the Supreme Court of North Carolina is given in open court and further notice waived . . ."

Such appeal to Supreme Court is perfected, and error is assigned.

*Robert S. Cahoon for appellants.*

*Nelson Woodson for North Carolina Finishing Company, appellee.*

*R. B. Overton, R. B. Billings, and D. G. Ball for Employment Security Commission of North Carolina, appellee.*

WINBORNE, J.  G.S. 96-14 (d) of the Employment Security Law of North Carolina provides that "An individual shall be disqualified for benefits . . . (d) For any week with respect to which the commission finds that his total or partial unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment, or other premises at which he is or was last employed . . ."

Admittedly in the case in hand a stoppage of work because of a labor dispute occurred on 24 March, 1952, at the plant of the North Carolina Finishing Company at which claimant-employees were last employed. A strike, involving all production and maintenance employees, was commenced on that day, and continued until 7 June, 1952, and claimant-employees participated, and were interested in the strike, and the causes of it, and were unemployed during the strike.

And the appellants state in their brief filed on this appeal that "the sole issue, and the only one upon which evidence was taken, was whether the appellants were disqualified to receive benefits under the provisions of Section 96-14 (d) of the General Statutes . . ."

Indeed, the claimant-appellants have the burden to show to the satisfaction of the Commission that they were not disqualified for benefits under this section of the Employment Security Law. *In re Steelman,* 219 N.C. 306, 13 S.E. 2d 544; *Employment Security Com. v. Jarrell,* 231 N.C. 381, 57 S.E. 2d 403.

And it is provided in G.S. 96-15 (i) that on appeal to the Superior Court from any final decision of the Employment Security Commission, the findings of the Commission as to the facts, if supported by evidence, and in the absence of fraud, shall be conclusive and the jurisdiction of the court is confined to questions of law. And an appeal may be taken from the decision of the Superior Court, as provided in civil actions.

A reading of the record on this appeal reveals ample evidence to support the findings of fact made by the Special Claims Deputy, and adopted and affirmed by the Commission. And there is no suggestion of fraud. Hence the findings of the Commission are conclusive on appeal to Superior Court and in this Court. *Unemployment Compensation Comm. v. Martin,* 228 N.C. 277, 45 S.E. 2d 385; *Employment Security Comm. v. Kermon,* 232 N.C. 342, 60 S.E. 2d 580.

Therefore in the light of the findings of fact of the Commission, does it follow as a matter of law that the unemployment of claimant-employees, after the strike ceased to exist to date of the hearing before the Special Claims Deputy, to wit, 27 June, 1952, was due to a stoppage of work which existed because of the labor dispute?

This exact question has not been presented heretofore to this Court. However, it has been considered and passed upon by courts of other states which have adopted statutes in almost identical language as G.S. 96-14 (d). See *Carnegie-Illinois Steel Corp. v. The Review Board of the Indiana Employment Security Division, et al.* (1947) (Ind.), 72 N.E. 2d 662; *Blakely v. Employment Security Division, et al.* (1950) (Ind.), 90 N.E. 2d 353; *Chrysler Corp. v. Review Board* (1950) (Ind.), 92 N.E. 2d 565; *American Steel Foundries v. Gordon* (1949) (Ill.), 88 N.E. 2d 465; *Ablondi, et al. v. Board of Review, Division of Employment Security Dept. of Labor and Industry, et al.* (1950) (N.J.), 73 A. 2d 262; *Magner v. Kinney* (1942) (Neb.), 2 N.W. 2d 689; *Saunders v. Maryland Unemployment Compensation Board* (1947), 53 A. 2d 579; *Bako, et al., v. Unemployment Compensation Board of Review* (Pa.), 171 Pa. Super. 222, 90 A. 2d 309; *M. A. Ferst Limited v. Huiet* (1949) (Ga.), 52 S.E. 2d 336.

While these decisions of other courts are not controlling here, they appear to have been well considered, and decided, and are most persuasive. There, as here, the statute under consideration is in plain and unambiguous language, and needs only a literal interpretation to ascertain the legislative intent as expressed in the statute.

The trend of these decisions is, as expressed in the *Carnegie case, supra,* that "a stoppage of work commences at the plant of the employer when a definite check in production operations occurs," and "a stoppage of work ceases when operations are resumed on a normal basis"; but that "the stoppage of work caused by a labor dispute must not exceed the time which is reasonably necessary, and required to physically resume normal operations in such plant or establishment."

And as stated in the *Saunders case, supra,* "The benefits of the law are denied only when the unemployment is due to a labor dispute. Whether it is, or whether it is not, is a question to be determined in each case. The line of demarcation is not the end of the strike but the end of work stop-

page due to the strike. That test is applied to all alike, and there is no discrimination."

In the light of these principles, the Employment Security Commission of North Carolina has found as a fact that the unemployment of claimant-employees after the strike was called off was "due to a stoppage of work caused by a labor dispute," and will continue "so long as there is a stoppage of work attributable to a labor dispute at the plant" of the employer.

Indeed, there is nothing on this record to show that the stoppage of work at the plant of the North Carolina Finishing Company exceeded the time reasonably necessary and "required to physically resume normal operations" in the chain process method of operation in use at its plant, as found by the Commission.

After careful review of the record and case on appeal, error in matters of law is not made to appear. Hence, the judgment from which appeal is taken is

Affirmed.