FRANK MAGNER ET AL., APPELLEES, V. VINCENT B. KINNEY, COMMISSIONER OF THE NEBRASKA STATE DEPARTMENT OF LABOR, APPELLEE: FIDELITY STORAGE & VAN COMPANY, INC., APPELLANT.

2 N. W. (2d) 689

FILED MARCH 6, 1942. No. 31214.

*Swarr, May & Royce* and *James M. Paxson,* for appellant.

*David D. Weinberg* and *John E. Sidner, contra.*

Heard before SIMMONS, C. J., EBERLY, PAINE, MESSMORE and YEAGER, JJ., and FALLOON and ELLIS, District Judges.

ELLIS, DISTRICT JUDGE.

This is a proceeding under our "Unemployment Compensation Law" (Comp. St. Supp. 1939, secs. 48-701 to 48-724, inclusive), which will be hereinafter referred to as the "Act," in which the appellees, Frank Magner, Harry H. Snook and G. A. Wolff, seek to obtain unemployment compensation benefits from the department of labor of this state, to be

charged against the reserve account of the appellant herein, their former employer. In the district court appellant defended against claimants' demands, insisting that claimants' unemployment was due to their own "stoppage of work" and their own voluntary act of striking because of a labor dispute; that unemployment benefits should be denied by reason of claimants' failure to appeal their original claims for unemployment compensation filed by them on January 3, 1939, which, after due investigation, had been denied on the ground that the claimants' total unemployment was due to stoppage of work which existed because of a labor dispute in the establishment in which they were last employed; also because of claimants' failure and refusal to accept reemployment, and furthermore because of claimants' continued participation in the strike, and the fact that there was still a very considerable and substantial loss of business at the plant of appellant, from which we are asked to infer from the record that it evidenced a stoppage of work in part at least. The trial *de novo* in the district court for Douglas county on appeal from the order and finding of the "Appeal Tribunal," as provided by the Act, resulted in a decision adverse to appellant herein and from that order this appeal is prosecuted.

In this proceeding the district court adjudged "that no stoppage of work existed on May 8, 1939, the date plaintiffs' claims were filed, because of a labor dispute at the establishment at which plaintiffs were last employed. The court is of the opinion, and so finds, that the term 'stoppage of work,' which appears in subsection (d) of section 48-705, Comp. St. Supp. 1939, refers to an existing condition at the former place of employment on the date of the claims and not to the original cause of any claimant's unemployment." The district court set aside the decision of the "Appeal Tribunal" and allowed benefits to the claimants.

It is conceded that, so far as length and terms of employment by defendant Fidelity Storage & Van Company, Inc., are concerned, each of the plaintiffs is entitled to the unemployment benefits under the Act, unless disqualified by

the restrictions contained in section 5 of the Act. Comp. St. Supp. 1939, sec. 48-705.

But a preliminary to further consideration of the matters presented by this record is the contention on the part of the claimants that we have here a case where the employees are the subjects of a "lockout" by the employer; and the contention on part of the employer that we are here dealing with a "strike" instituted and carried on by these men. It is conceded that claimants are all members of Local No. 554, which is the Truck Drivers' Union.

From the evidence it appears that prior to June, 1938, this union had an existing labor contract covering terms and conditions of employment with the Nebraska Truckers Association, to which the Fidelity Storage & Van Company belonged, and of which the firms and organizations pursuing a similar vocation in Omaha and vicinity were members. Negotiations had been going on between the representatives of the parties to this contract with reference to an extension and modification of this contract and were in progress in June, 1938, at the time that contract, according to its terms, expired. These negotiations continued until September, 1938, at which time the undisputed evidence is that all parties were in accord except as to the issue of the "closed shop" demanded by the union. In these negotiations the local drivers and their union were represented by several individuals. In early September, 1938, these representatives went to Indianapolis and had a conference with Mr. Tobin, head of the International Union, with which Local Union No. 554 was affiliated. From that city a telegram was sent by the representatives of the drivers' union to the Nebraska Truckers Association giving the operators a 42-hour strike notice. The service of this strike notice was a requirement under the terms of the contract between the parties which by its terms expired in June, 1938. The evidence in the record is without substantial contradiction that on or about September 13, 1938, or Monday following the delivery of the Indianapolis telegram, all "union men" then employed by the Fidelity

Storage & Van Company, including the three claimants herein, without further individual demand on or protest to their employer, quit their employment and thereafter failed to report for duty as was customary. Upon this occasion claimants were not discharged or directed to remain away from their usual places of employment by their employer. But it also appears that since the date of this cessation of work by its employees the business houses and premises of the Fidelity Storage & Van Company have been continuously picketed by members of Union No. 554, and while claimants herein did not "picket" the business and premises of their former employer, they did participate in the picketing of other organizations against whom this same strike order was directed. Claimants also admit that since the strike order was issued they were paid strike benefits a number of times from their union organization during the continuance of this labor dispute.

The nature of the claim of plaintiffs herein that a "lockout" existed is disclosed by the following testimony of claimant Snook: "To explain that I'll go back to around the first of June of 1938. At that time there was trouble at the Watson Transfer Company and one afternoon Mr. Koller (manager of the Fidelity Storage & Van Company) called the employees on the second floor of the building and he told us (he didn't tell me personally), or rather he told the drivers to put the trucks in the garage and leave them sit there until this thing was settled; that he didn't want his trucks smashed up. I believe those were the words that were used. Then he told us to go home; that's my recollection of it."

This is also testified to by claimant Wolff as follows: "I can't tell you that unless I start back in June, 1938. In June Koller told us to take the trucks in on Friday noon. He said he didn't want his trucks torn up because Watson's had struck. We went down Saturday and Monday mornings, but Koller said nothing doing, and Monday night we had a meeting at the hall. They said they were going to negotiate on a contract for thirty days until about the first of

July, but we kept working until the 9th day of September. We weren't working under contract during that time. * * * Q. You did continue to work until September, 1938? A. Yes."

The interruption of work in June, 1938, appears to have been for not more than three days and work had been practically continuous thereafter until September. It is obvious that a claim of a "lockout" in September, 1938, based upon what occurred in June, 1938, as the facts relating thereto appear in the evidence in this case, cannot be sustained.

We understand, in labor disputes, to "lockout" is "to withhold employment from (a body of employees) as a means of bringing them to accept the employer's terms." Webster's New International Dictionary (2d ed.) 1450. Where a temporary suspension of work occurs due to the dangers of destruction or damage to which the employer's property would otherwise be exposed and no measures are taken except such as are reasonably required to insure the safety of the same, such action taken by the employer cannot be deemed a "lockout."

A "strike" is ordinarily defined as the "act of quitting work; specif., such an act done by mutual understanding by a body of workmen as a means of enforcing compliance with demands made on their employer; a stoppage of work by workmen in order to obtain or resist a change in the conditions of employment." Webster's New International Dictionary (2d ed.) 2496. See *People v. Tepel*, 3 N. Y. Supp. (2d) 779; *Iron Molders' Union v. Allis-Chalmers Co.*, 166 Fed. 45, 20 L. R. A. n. s. 315; *Farmers Loan & Trust Co. v. Northern P. R. Co.*, 60 Fed. 803; *Keith Theatre v. Vachon*, 134 Me. 392, 187 Atl. 692; Restatement, Torts, sec. 797; *Philip Henrici Co. v. Alexander*, 198 Ill. App. 568.

In short, "A strike is cessation of work by employees in an effort to get for the employees more desirable terms. A lockout is a cessation of the furnishing of work to employees in an effort to get for the employer more desirable terms." *Iron Molders' Union v. Allis-Chalmers Co.*, 166 Fed. 45, 20 L. R. A. n. s. 315.

In view of the evidence as an entirety, the conclusion is inescapable that we are here considering a "strike" and not a "lockout."

The next question for our consideration is the challenge to the interpretation given by the district court to the words of the statute, section 48-705: "An individual shall be disqualified for benefits * * * (d) For any week with respect to which the commissioner finds that his total unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment, or other premises at which he is or was last employed: Provided," etc. The district court construed this language to mean "that the term 'stoppage of work,' which appears in subsection (d) of section 48-705, Comp. St. Supp. 1939, refers to an existing condition at the former place of employment on the date of the claims and not to the original cause of any claimant's unemployment." In other words, the technical meaning of the term, "stoppage of work," as used in our disqualification clause, is a substantial curtailment of work in an establishment, not the cessation of work by the claimant or claimants.

The language of our unemployment compensation law quoted above was a substantial reenactment of the English National Insurance Act of 1911. See Statutes 1-2, Geo. V., ch. 55, sec. 87, which was amended in 1924 by section 4 (1), ch. 30, Statutes 14-15, Geo. V. This language, it appears, had received a settled construction by the English authorities charged with the administration of this English act long prior to the adoption of it by ourselves.

The well-established rule of construction applicable to this Nebraska enactment, under these circumstances, is that a state by adopting a statute of another state adopts the construction which has been given the statute so adopted by such other state. And, "In the absence of any judicial decision determining the construction and effect of a foreign statute, the practical interpretation given to it by those whose duty it was to apply and administer it affords the best means of ascertaining its true construction; and such

construction will be followed, unless it be clear that such officers have misinterpreted it." *United States v. Sherebeck,* 27 Fed. Cas. 1062. See, also, 59 C. J. 1033.

It appears that the English statutes heretofore referred to provided for no judicial review and therefore have not been construed by the courts of England. However, the construction of the term, "stoppage of work," as made by the district court for Douglas county, is in entire harmony with the well-settled construction of these words as embodied in the original English statute by the English officials whose duty it was to apply and administer it. This construction is accordingly accepted by this court.

The following evidence is without substantial contradiction: All truckers who belonged to the Nebraska Truckers Association (of which the Fidelity Storage & Van Company was one) had a contract with the drivers union "last year" relating to wages, terms and conditions of employment. This contract expired in June, 1938. When the contract expired negotiations were opened to modify the contract, and there was an agreement between union officials who represented claimants herein and the truckers association that the old contract and its terms should remain in force pending negotiations. These negotiations continued until in September following, when disagreement over the demand of the employees for a "closed shop" contract resulted in the strike order of September 13, 1938. It is obvious that a labor dispute existed between these parties from and after June, 1938. This ripened into a strike in September, 1938. The Act does not require consideration of the demands, negotiations and other events which preceded the final rupture, except for the purpose of determining whether they constituted a labor dispute.

Having determined that claimants' unemployment arises out of a labor dispute, the principal and disposing test of the claim for benefits is whether the unemployment is due to a "stoppage of work" at the place of employment where last employed.

The phrase as used in the disqualification clause, subsec-

tion (d), refers to the effect upon the employer's operations produced by the labor dispute or, in other words, to resulting unemployment. Subject to its exceptions, it declares disqualification of a class or group whose unemployment is the result of the curtailment or stoppage of the employer's operations. It does not refer to the cessation of work by the individual employee or employees. The disqualification is is not personal, but rather for a period of time—the duration of the stoppage.

A labor dispute may produce a stoppage or curtailment of work in an employing establishment in three ways: (1) The cessation of work by all or part of the employees; (2) the cessation of work by a part of the employees may disable the employer from utilizing the services of other employees; (3) it may diminish patronage by customers or the public of the employing establishment and thereby produce a compensating unemployment of workers. In either event the resulting unemployment is due to a stoppage of work because of the labor dispute. Obviously, if those leaving work are immediately replaced, or if the dispute does not otherwise interfere with production or operation and these are not diminished, there is no stoppage of work and hence no disqualification.

While we agree in principal with the definition of "stoppage of work" adopted by the district court in the present case, we are unable to agree with the application of that definition to the facts presented by the record.

Where there is a resulting curtailment of work, when is it substantial? Substantial stoppages of work have been held to exist where seven out of fifty-five men were on strike (N. J. Bd. Rev. BR-15 L 1939); where operations were resumed with three-fourths of the normal crew (Or. Referee's Dec. No. 38-RA-149, June, 1938); and where there was a 20 per cent. decrease of production (N. J. Bd. Rev. BR-65 L 1939). In the instant case the evidence establishes not only the abandonment by the strikers of their employment with Fidelity Storage & Van Company in September, 1938, but thereafter a definite and continued inter-

ference with its business and employees occasioning a decrease of the total business transacted by it in excess of 30 per cent.

In view of the situation outlined, as a result of this labor dispute which developed into and continued as a strike, a substantial "stoppage of work" was occasioned which is effectual to deny claimants benefits under the express terms of our unemployment compensation law.

We do not find it necessary to consider other matters urged. It follows, therefore, that the district court erred in the judgment entered herein, and it is hereby reversed and the cause remanded.

REVERSED.

EBERLY, J., dissenting.

From the facts detailed in the record in this case, most of which are recited in the majority opinion, the following are to be kept in mind: The appellees, Magner, Snook and Wolff, were employees of the appellant, Fidelity Storage & Van Company, Inc., and members of Local Union No. 554, the Truck Drivers' Union, a labor organization. So far as length and terms of employment are concerned, each was entitled to unemployment benefits under the terms of the Nebraska unemployment compensation law, unless disqualified by the restrictions contained in section 5 of that act (Laws 1937, ch. 108). On September 9, 1938, due to a labor dispute between the representatives of the Fidelity Storage & Van Company and the labor union, of which appellees were members, these claimants voluntarily left their work and, because of a denial of their demands for a "closed shop," thereafter for a certain period, and to an extent, participated in a strike called by that union. On January 3, 1939, appellees filed their claims for unemployment benefits, which were denied. On May 8, 1939, claimants again filed claims for unemployment benefits, which form the basis of the proceedings finally determined by the opinion adopted herein. Appellant's brief informs us that "The Union continued to picket and harass appellant (Fidelity

Storage & Van Company) until in August, 1939, when it apparently abandoned the strike."

The history of the enactments of the unemployment compensation law in Nebraska includes the following: The adoption of chapter 108, Laws 1937, approved with an emergency clause April 30, 1937. The adoption of chapter 56, Laws 1939, an amendatory enactment adopted with an emergency clause and approved June 5, 1939. The adoption of chapter 2, Laws 1940, Extraordinary Session, and approved with an emergency clause January 12, 1940; and the adoption of chapter 94, Laws 1941, approved with an emergency clause May 27, 1941.

It would seem that the causes of action here involved are for benefits accruing under the unemployment compensation law of 1937, on which suit was commenced on May 8, 1939, and would be in no manner affected by the provisions of the amendatory statute adopted and approved June 5, 1939, or any amendatory statute enacted subsequent thereto. Comp. St. 1929, sec. 49-301.

It would follow, therefore, that the terms of the unemployment compensation law of 1937 are exclusive and controlling in this case notwithstanding the provisions of section 19, ch. 108, Laws 1937. The conclusion follows that the reference to Comp. St. Supp. 1939, contained in the majority opinion, should be read in the light of that fact.

The legislative intent evinced by this enactment is the creation and establishment of a statutory trust fund in the manner directed, to be administered for the benefit of unemployed labor by statutory agencies designated, subject to and upon conditions as set forth therein. In effect, it vested employee beneficiaries with a cause of action to secure their rights thereunder for each successive week of unemployment suffered. And section 5, in effect, vested the employer with certain specific defenses as to the demands of such employees which, if sustained, resulted in the disqualification of such employees, but only for definite periods, from receiving benefits under the terms of the act. These included, among others, disqualification for benefits, "(a)

For the week in which he has left work voluntarily without good cause," etc. " (c) If the commissioner finds that he has failed, without good cause, either to apply for available, suitable work, * * * or to accept suitable work when offered him," etc. " (2) * * * (d) For any week with respect to which the commissioner finds that his total unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment, or other premises at which he is or was last employed." It will be noted that these several defenses (as well as the others set out in section 5) thus created by statute are separate, distinct, and not inconsistent one with the other.

As to legal remedies which the foregoing legislation may necessarily imply, it may be said that under our Civil Code we have, "but one form of action," which we call a "civil action." Comp. St. 1929, sec. 20-101. And when, as here, a special or general act vests a right of action without specifying the mode of proceeding, as far as may be consistent with such statute and practicable under the Civil Code, "the proceedings shall be conducted in conformity thereto." Comp. St. 1929, sec. 20-2226.

Recurring to the Civil Code we find the applicable provision to the present controversy is that the employer, a defendant, "may set forth in his answer as many grounds of defense * * * as he may have." Comp. St. 1929, sec. 20-812. See *Maier v. Romatzki*, 95 Neb. 76, 144 N. W. 1036; *Equitable Life Assurance Society v. Wert*, 102 Fed. (2d) 10.

In the absence of statute, an enlightened public policy would dictate that disputes and also agreements between employer and employee should be determined promptly and fully, to the end that turmoil be ended, production be continued, and public interest be advanced. The nature of the relations here involved necessitates the application of equitable principles in determination of the issues which may arise in the trial of a controversy thus created. And where the defenses provided for by section 5 of our unemployment compensation law (1937) have been raised by the employer and issues taken thereon by the employees, it follows that

upon due proof adduced the several issues should be fully and finally determined and further and future disputes and delays avoided. Parties are entitled to this as a matter of right. *Sutherland v. Rose,* 47 Barb. (N. Y.) 144.

The situation clearly invokes the equitable rule that, "The decree should respond to all the pleadings and determine all the issues." 21 C. J. 670. See, also, authorities collated in notes 8 and 9, 21 C. J. pp. 670-672.

This jurisdiction has long been committed to this principle which was announced by Sullivan, J., in *Clark v. Neumann,* 56 Neb. 374, 76 N. W. 892: "The findings and decree in an action in equity should respond to all the material issues presented by the pleadings."

These principles are applicable and controlling in the instant case. The pleadings and proof liberally construed clearly establish that claimants voluntarily left their work without good cause, unless the refusal of the employer to grant their demands for a "closed shop" may be deemed "good cause." The evidence is undisputed that negotiations between the truck drivers and the employer which had continued from June, 1938, to September, 1938, had succeeded in eliminating every controversy between them save the issue of the "closed shop." The parties were otherwise in entire accord when on the latter date claimants, with the rejected claim for a "closed shop" as the sole reason for their action, voluntarily quit work. The same question is substantially presented and enters into the controversy as to whether claimants have "failed, without good cause, * * * to accept suitable work when offered" to them. This question the terms of the statute by fair implication answer with definiteness and certainty. At the very least the parties to this litigation are entitled to have this matter determined, and the controversy as an entirety settled as of the date of the institution of the proceedings, that their right to enjoy each successive weekly benefit as it ripens and accrues may not be delayed or interfered with. In principle it cannot be gainsaid that a tribunal administering relief in accord with equitable principles is possessed of power, and

is enjoined with the duty, when it has acquired jurisdiction, to consider and determine all rights of the parties relating to the subject-matter, and to enter a decree that will finally determine them, to the end that multiplicity of suits may be avoided and litigation may cease. In the instant case the principles of equity should be carried out by the determination of all the issues actually presented and tried by the parties to the proceeding. Thus only may claimants know their rights and the administrators of this act be enabled to perform their duties with promptness and correctness in the distribution of the benefits intended.

This conclusion has added force when we reflect that the adjudication as made by the majority opinion based upon the sole ground that because of an existing strike a "stoppage of work" exists which operates to disqualify claimants has no force and potency after such "strike" has ceased and the "stoppage of work" has ended. *In re Steelman,* 219 N. Car. 306, 13 S. E. (2d) 544.

After such event the parties to this litigation will necessarily have to recur again to the provisions of section 5 to determine the questions of disqualification then existing. These questions, subject to the time limitations, will necessarily include whether claimants "left work voluntarily without good cause." Such questions should have been determined in the present proceeding, but the majority have postponed their decision to the uncertain future when evience may be hard to secure and recollections are not vivid. Obviously, at best, we thus have another instance of compelling unnecessary litigation, of justice delayed, which results all too often in justice denied. I, therefore, dissent from the disposition made of this case by the majority opinion, as a job lacking in full performance, and a repudiation of the solemn duty enjoined on this court of awarding relief full, complete and final.

MESSMORE, J., concurs in the dissent.